UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DISABILITY RIGHTS NEW YORK,

                              Plaintiff,

v.                                                              1:20-CV-1487
                                                                (GTS/CFH)
NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION; and ANTHONY J. ANNUCCI, in
his official capacity as Acting Commissioner of the
New York State Department of Corrections and
Community Supervision,

                              Defendants.

_____

APPEARANCES:                                    OF COUNSEL:

DISABILITY RIGHTS NEW YORK           BRANDY L. L. TOMLINSON, ESQ.
  Counsel for Plaintiff                          ALYSSA GALEA, ESQ.
44 Exchange Blvd., Suite 110                CHRISTINA ASBEE, ESQ.
Rochester, NY 14614

HON. LETITIA A. JAMES                      BRIAN W. MATULA, ESQ.
Attorney General for New York              Assistant Attorney General
  Counsel for State Defendants
The Capitol
Albany, NY 12224

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

        Currently before the Court, in this civil rights action filed by Disability Rights New York

("Plaintiff") against the New York State Department of Corrections and Community Service

("DOCCS") and Acting Commissioner of DOCCS Anthony J. Annucci ("Defendants"), is

Plaintiff's motion for a preliminary injunction requiring Defendants to provide access and copies

of certain documents requested pursuant to Plaintiff's authority as the designated protection and

advocacy ("P&A") system for New York.  (Dkt. No. 7.)  For the reasons set forth below,

Plaintiff's motion is granted in part (i.e., with regard to Incarcerated Individual B) and denied in part (i.e., with regard to Incarcerated Individual A).

I.      **RELEVANT BACKGROUND**

      A.      **Plaintiff's Complaint**

Generally, in its Complaint, Plaintiff asserts three claims: (1) a claim that Defendants' refusal to timely provide complete and unredacted records at Plaintiff's request violates the Developmental Disabilities Assistance and Bill of Rights Act of 2000 ("DD Act"); (2) a claim that Defendants' refusal to promptly provide records at Plaintiff's request violates the Protection and Advocacy for Individuals with Mental Illness Act of 1986 ("PAIMI Act"); and (3) a claim that the New York state laws that allow for redaction of certain records produced to Plaintiff are preempted by the DD and PAIMI Acts.  (Dkt. No. 1 [Pl.'s Compl.].)

Generally, Plaintiff's claims arise from Defendants' inadequate response to records requests that Plaintiff has made, pursuant to its authority as the P&A system for New York, for Incarcerated Individual A and Incarcerated Individual B, between approximately February 13, 2020, and December 3, 2020.  (*Id.*)  More specifically, Plaintiff's Complaint alleges as follows: (a) as to Incarcerated Individual A, Plaintiff's representative physically inspected the relevant records at the correctional facility where Incarcerated Individual A is housed and tabbed which records they wanted Defendants to copy, but Defendants not only did not produce those copies in a timely manner under the Acts, but also improperly withheld certain pages as exempt under state law and redacted portions of those records that they did copy and provide; and (b) as to Incarcerated Individual B, Plaintiff requested physical access to (and copies of) the relevant records, but Defendants stated that those records would not be available because Incarcerated Individual B's death was subject to a pending investigation by the New York State Commission

of Correction ("SCOC"), and later told Plaintiff that a request for records related to that investigation could be submitted directly to SCOC.  (*Id.*)

**B.     Relevant Procedural History**

This case is the latest iteration of an ongoing disagreement between Plaintiff and Defendants about the provision of records related to individuals with mental or developmental disabilities incarcerated in DOCCS facilities.  *See Disability Rights New York v. New York State Dep't of Corrs. and Cmty. Supervision*, 18-CV-0980 (GTS/CFH).  On December 3, 2020, Plaintiff filed its Complaint in this action.  (Dkt. No. 1.)  On December 4, 2020, Plaintiff filed the current motion for preliminary injunction, seeking an order forcing Defendants to provide complete and unredacted records pursuant to Plaintiff's requests and in compliance with the relevant P&A Acts.  (Dkt. No. 7.)  On February 5, 2021, Defendants filed their opposition.  (Dkt. No. 18.)  Finally, on February 12, 2021, Plaintiff filed its reply.  (Dkt. No. 19.)

**C.     Summary of Parties' Briefing on Plaintiff's Motion**

**1.     Plaintiff's Memorandum of Law**

Generally, in its motion, Plaintiff makes three arguments.  (Dkt. No. 7, Attach. 3, at 8-14 [Pl.'s Mem. of Law].)  First, Plaintiff argues that it is entitled to unredacted records under the P&A Acts, which preempt state law.  (*Id.* at 10-13.)  More specifically, Plaintiff argues that (a) its request was pursuant to the P&A Acts and thus preempts any state Freedom of Information Law ("FOIL") or privacy laws, (b) its requests are not impacted by the Health Insurance Portability and Accountability Act ("HIPAA") because the P&A Acts permit access to information that is otherwise protected by HIPAA and, in any event, Plaintiff obtained the requisite HIPAA release forms where required, (c) regarding information that Defendants redacted from the records of Incarcerated Individual A, there was no privacy or confidentiality

reason for Defendants to redact copies of those records because Defendants had already permitted Plaintiff to physically inspect the unredacted version of those records, and (d) because Defendants are required to disclose any draft reports from investigatory agencies and information or records used or reviewed when preparing investigatory reports, the fact that an investigation was still ongoing into the death of Incarcerated Individual B was not grounds to deny access to relevant records that were available.  (*Id.*)

Second, Plaintiff argues that it is entitled to access to the requested records within a specific timeline under the P&A Acts (within three business days of when the written request is received under the DD Act, and "promptly" under the PAIMI Act, which Plaintiff asserts has been interpreted to mean within five business days), yet Defendants have not been complying with the required timeline.  (*Id.* at 13-14.)  Plaintiff acknowledges that the COVID-19 pandemic may have played a role in the delays, but that the delays are still unacceptable even considering that circumstance and, in any event, its requests pre-date when New York State began its shutdown in response to the pandemic and, had Defendants followed the proper timeline, those requests could have been resolved before the pandemic became an factor.  (*Id.*)

Third, Plaintiff argues it is entitled to a preliminary injunction.  (*Id.* at 15-18.)  More specifically, Plaintiff argues that (a) it is likely to succeed on the merits of its claims because it has shown that it has been denied timely access to the records requested pursuant to its authority as a P&A system, (b) it has suffered, and will continue to suffer, irreparable harm because the lack of access prevents it from carrying out its statutory mandate to protect New Yorkers with mental and developmental disabilities, (c) the balance of hardships favors Plaintiff because its inability to pursue timely investigations and provide competent legal representation due to Defendants' refusal to provide records as required puts its clients in danger of further abuse or

neglect, while Defendants face no hardship in simply complying with the law and allowing federally permissible investigations, and (d) the public interest will be served by granting a preliminary injunction because the public has an interest in ensuring that individuals with disabilities are protected from abuse or neglect.  (*Id.*)

### 2.    Defendants' Opposition Memorandum of Law

Generally, in their opposition memorandum of law, Defendants make four arguments. (Dkt. No. 18, at 3-16 [Defs.' Opp'n Mem. of Law].)  First, Defendants argue that the Court must apply a stricter standard than usual when assessing whether Plaintiff is entitled to a preliminary injunction because Plaintiff is seeking a mandatory preliminary injunction in that such an injunction would grant essentially all the relief they seek and such action could not later be undone by a judgment in Defendants' favor.  (*Id.* at 3.)

Second, Defendants argue that Plaintiff has failed to show either a clear or substantial likelihood of success on the merits of its claims involving the records of Incarcerated Individual A or a strong showing of irreparable harm with regard to those claims.  (*Id.* at 4-9.)  More specifically, Defendants argue that (a) Plaintiff has not provided any proof from someone with first-hand knowledge regarding its efforts to obtain the records of Incarcerated Individual A, (b) the records that Plaintiff now claims were improperly redacted were not the same ones that it physically inspected at Five Points Correctional Facility ("Five Points"), but rather were in response to a request for separate and unrelated records from Sullivan Correctional Facility ("Sullivan"), and Plaintiff has not provided copies of the relevant request for access or authorizations related to the records from Five Points, (c) there is no strong showing of irreparable harm because, even if the copies of records provided to Plaintiff were redacted, Plaintiff had physically reviewed unredacted versions of those records and thus the failure here

was not one of "access" to records (as required by the governing statutes and regulations) but rather a failure to deliver unredacted copies of records that Plaintiff had already accessed, and (d) the fact that Plaintiff waited nearly a year after receiving Incarcerated Individual A's request for legal assistance before making a request of Defendants undermines Plaintiff's argument that it urgently needs the records of Individual A.  (*Id.*)

Third, Defendants argue that Plaintiff has failed to show either a clear and substantial likelihood of success on the merits of its claims involving the records of Incarcerated Individual B or a strong showing of irreparable harm with regard to those claims.  (*Id.* at 9-15.)  More specifically, Defendants argue that (a) Plaintiff never requested physical access to these records, but rather demanded an estimate for the cost of producing copies of certain of the records (which had not yet been inspected or selected for copying by Plaintiff), and (b) Plaintiff has failed to show that it had probable cause for believing that Incarcerated Individual B had been subjected to abuse or neglect in that it provided no evidence showing the details (e.g., the dates, sources, form, or substance) of the vague "complaints" that it received regarding Incarcerated Individual B's treatment (thus precluding judicial review of this purported probable cause determination). (*Id.*)

Fourth, Defendants argue that Plaintiff's claims concerning production of the records of Incarcerated Inmate A are now moot because (a) Plaintiff was given (and availed itself of) unrestricted access to these records on March 11, 2020, and was offered such access again on October 1, 2020 (and thus there has been no denial of access), and (b) although Plaintiff did not provide the proper authorizations from Incarcerated Inmate A in its December 2020 application, Plaintiff has since provided those authorizations and Defendants have sent the initially withheld records to Plaintiff.  (*Id.* at 15-16.)

### 3.      Plaintiff's Reply Memorandum of Law

Generally, in its reply memorandum of law, Plaintiff makes four arguments.  (Dkt. No. 19, at 2-9 [Pl.'s Reply Mem. of Law].)  First, Plaintiff argues that Defendants' belated provision of copies of the initially withheld records of Incarcerated Individual A does not resolve the parties' dispute regarding those records because the copies were still unlawfully redacted.  (*Id.* at 2-3.)

Second, Plaintiff argues that Defendants' asserted reasons for denying access to Incarcerated Individual A's records for 11 months are not supported by the record.  (*Id.* at 3-5.) More specifically, Plaintiff argues that Defendants inaccurately attempt to confuse a record request from Five Points with a record request from Sullivan: the only request at issue in this action (with regard to the records of Incarcerated Individual A) is related to the records obtained at Five Points.  (*Id.*)  Moreover, Plaintiff argues that Defendants' current argument that they did not initially produce 83 pages of records because Plaintiff lacked the required authorizations is undermined by the fact that (a) the reason Defendants originally gave (in their rewritten response to Plaintiff's request) for withholding or redacting those pages was that those pages were exempt from release under state laws, and (b) in any event, the record supports the fact that Defendants have had the required releases since March of 2020 (which is why Defendants originally granted Plaintiff physical access to the records, and then sent Plaintiff copies of 569 pages of tabbed records).  (*Id.*)  Finally, Plaintiff argues that the fact that it had physical access to the unredacted records before copying does not fulfill Defendants' obligations under the P&A Acts and does not suggest the absence of irreparable harm, because Plaintiff may select both a physical inspection and copies of records, and Defendants do not have the right to choose what forms of access Plaintiff is entitled to.  (*Id.*)

7

Third, Plaintiff argues that it has shown a clear and substantial likelihood of success on the merits of its claims involving the records of Incarcerated Individual B. (*Id*. at 7-9.) More specifically, Plaintiff argues that it is entitled to access the records of Incarcerated Individual B regardless of whether there is a pending SCOC investigation into the death of that individual. (*Id*.) Furthermore, Plaintiff argues that Defendants are incorrect that a physical inspection of records by Plaintiff is a prerequisite to its right to receive copies of those records where, as here, the records have been adequately described to avoid the need for a search by the records custodian. (*Id*.) Finally, Plaintiff argues that Defendants' argument that they denied access to these records on the ground that Plaintiff failed to provide evidence of probable cause is without merit because (a) the argument is undermined by the fact that, at the time of denial, Defendants based the denial only on the pending SCOC investigation, and (b) in any event, federal law makes the P&A system the final arbiter of whether probable cause exists, and Plaintiff is not required to provide specific information about the complaints it received or the evidence it considered. (*Id.*)

Fourth, Plaintiff argues that it has suffered irreparable harm because the denial of unredacted copies of the records at issue prevents it from fulfilling its constitutional mandate to investigate allegations of abuse or neglect of individuals with mental illness or developmental disability. (*Id.*)

## II.    GOVERNING LEGAL STANDARD

### A.    Legal Standards Governing Motions for Preliminary Injunction

"'The purpose of a preliminary injunction is . . . to preserve the relative positions of the parties.'" *N. Am. Soccer League, LLC. v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37-38 (2d Cir.

2018) ("*N. Am. Soccer*") (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 [1981]).  "A preliminary injunction is an 'extraordinary and drastic remedy' . . . ; it is never awarded as of right . . . ."  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (internal citations omitted). Generally, in the Second Circuit, a party seeking a preliminary injunction must establish the following three elements: (1) that there is either (a) a likelihood of success on the merits and a balance of equities tipping in the party's favor or (b) a sufficiently serious question as to the merits of the case to make it a fair ground for litigation and a balance of hardships tipping decidedly in the party's favor; (2) that the party will likely experience irreparable harm if the preliminary injunction is not issued; and (3) that the public interest would not be disserved by the relief.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (reciting standard limited to first part of second above-stated element and using word "equities" without the word "decidedly"); *accord, Glossip v. Gross*, 135 S. Ct. 2726, 2736-37 (2015); *see also Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015) (reciting standard including second part of second above-stated element and using words "hardships" and "decidedly"); *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010) (holding that "our venerable standard for assessing a movant's probability of success on the merits remains valid [after the Supreme Court's decision in *Winter*]").

With regard to the first part of the first element, a "likelihood of success" requires a demonstration of a "better than fifty percent" probability of success.  *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *disapproved on other grounds, O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, n.2 (1987).  "A balance of equities tipping in favor of the party requesting a preliminary injunction" means a balance of the hardships against the benefits.  *See, e.g., Ligon v. City of New York,* 925 F. Supp.2d 478, 539 (S.D.N.Y. 2013) (characterizing the balancing

"hardship imposed on one party" and "benefit to the other" as a "balanc[ing] [of] the equities");

*Jones v. Nat'l Conference of Bar Examiners,* 801 F. Supp. 2d 270, 291 (D. Vt. 2011)

(considering the harm to plaintiff and any "countervailing benefit" to plaintiff in balancing the

equities; *Smithkline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.,* 99-CV-9214,

1999 WL 34981557, at *4-5 (S.D.N.Y. Sept. 13, 1999) (considering the harm to defendant and

the "benefit" to consumers in balancing the equities); *Arthur v. Assoc. Musicians of Greater New

York*, 278 F. Supp. 400, 404 (S.D.N.Y. 1968) (characterizing "balancing the equities" as

"requiring plaintiffs to show that the benefit to them if an injunction issues will outweigh the

harm to other parties"); *Rosenstiel v. Rosenstiel*, 278 F. Supp. 794, 801-02 (S.D.N.Y.1967)

(explaining that, in order to "balance the equities," the court "will consider the hardship to the

plaintiff . . . , the benefit to [the] plaintiff . . . , and the relative hardship to which a defendant will

be subjected") [internal quotation marks omitted].[1]

　　　With regard to the second part of the first element, "[a] sufficiently serious question as to

the merits of the case to make it a fair ground for litigation" means a question that is so

"substantial, difficult and doubtful" as to require "a more deliberate investigation."  *Hamilton

Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953); *accord, Semmes Motors, Inc.

v. Ford Motor Co.,* 429 F.2d 1197, 1205-06 (2d Cir. 1970).[2]  "A balance of hardships tipping

decidedly toward the party requesting a preliminary injunction" means that, as compared to the

hardship suffered by other party if the preliminary injunction is granted, the hardship suffered by

---

[1]　　See also *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12, n.2 (7th Cir. 1992)
("Weighing the equities as a whole favors X, making preliminary relief appropriate, even though
the *undiscounted* balance of harms favors Y.") [emphasis added].

[2]　　See also *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir.
1997); *Rep. of the Philippines v. Marcos,* 862 F.2d 1355, 1362 (9th Cir. 1988); *City of Chanute
v. Kansas Gas and Elec. Co.,* 754 F.2d 310, 314 (10th Cir. 1985); *R.R. Yardmasters of Am. v.
Penn. R.R. Co.*, 224 F.2d 226, 229 (3d Cir. 1955).

the moving party if the preliminary injunction is denied will be so much greater that it may be characterized as a "real hardship," such as being "driven out of business . . . before a trial could be held." *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 58 (2d Cir. 1979); *Int'l Bus. Mach. v. Johnson*, 629 F. Supp.2d 321, 333-34 (S.D.N.Y. 2009); *see also Semmes Motors, Inc.,* 429 F.2d at 1205 (concluding that the balance of hardships tipped decidedly in favor of the movant where it had demonstrated that, without an injunctive order, it would have been forced out of business as a Ford distributor).[3]

With regard to the second element, "irreparable harm" is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003). Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

With regard to the third element, the "public interest" is defined as "[t]he general welfare of the public that warrants recognition and protection," and/or "[s]omething in which the public as a whole has a stake[,] esp[ecially], an interest that justifies governmental regulation." Public Interest, *Black's Law Dictionary* (9th ed. 2009).

---

[3]     The Court notes that, under the Second Circuit's formulation of this standard, the requirement of a balance of *hardships* tipping *decidedly* in the movant's favor is added only to the second part of the first element (i.e., the existence of a sufficiently serious question as to the merits of the case to make it a fair ground for litigation), and not also to the first part of the first element (i.e., the existence of a likelihood of success on the merits), which (again) requires merely a balance of *equities* (i.e., hardships and benefits) tipping in the movant's favor. *See Citigroup Global Markets, Inc.*, 598 F.3d at 36 ("Because the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips decidedly' in its favor . . . , its overall burden is no lighter than the one it bears under the 'likelihood of success' standard.") (internal citation omitted); *cf. Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp.2d 186, 192 (E.D.N.Y. 2013) ("[T]he *Winter* standard . . . requires the balance of equities to tip in the movant's favor, though not necessarily 'decidedly' so, even where the movant is found likely to succeed on the merits.").

The Second Circuit recognizes three limited exceptions to the above-stated general standard. *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4.

First, where the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous "serious questions" standard but should grant the injunction only if the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim. *Id.* (citing *Able v. United States*, 44 F.3d 128, 131 [2d Cir. 1995]); *see also Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) ("A plaintiff cannot rely on the 'fair-ground-for-litigation' alternative to challenge governmental action taken in the public interest pursuant to a statutory or regulatory scheme.") (internal quotation marks omitted). This is because "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able,* 44 F.3d at 131.

Second, a heightened standard–requiring both a "clear or substantial" likelihood of success and a "strong" showing of irreparable harm"–is required when the requested injunction (1) would provide the movant with all the relief that is sought and (2) could not be undone by a judgment favorable to non-movant on the merits at trial. *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 [2d Cir. 2006]); *New York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) ("When either condition is met, the movant must show [both] a 'clear' or 'substantial' likelihood of success on the merits . . . *and* make a 'strong showing" of irreparable harm' . . . .") (emphasis added).

Third, the above-described heightened standard may also be required when the preliminary injunction is "mandatory" in that it would "alter the status quo by commanding

some positive act," as opposed to being "prohibitory" by seeking only to maintain the *status quo*. *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 34 [2d Cir. 1995]).[4]

**B.**     Legal Standards Governing Access to Records by a P&A System

Under the DD Act, a P&A system has the authority to, among other things, "investigate incidents of abuse and neglect of individuals with developmental disabilities if the incidents are reported to the system or if there is probable cause to believe the incidents occurred," and "have access to all records of (i) any individual with a developmental disability who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access," and "(ii) any individual with a developmental disability, in a situation in which . . . a complaint has been received by the system about the individual with regard to the status or treatment of the individual or, as a result of monitoring or other activities, there is probable cause to believe that such individual has been subject to abuse or neglect."  42 U.S.C. § 15043(a)(2).[5]  The P&A system is permitted "access" to the records of such individuals (and any other records that are relevant to conducting an

---

[4]     Alternatively, in such a circumstance, the "clear or substantial likelihood of success" requirement may be dispensed with if the movant shows that "extreme or very serious damage will result from a denial of preliminary relief."  *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 34 [2d Cir. 1995]).

[5]     "Records" include the following: "(1) a report prepared or received by any staff at any location at which services, supports, or other assistance is provided to individuals with developmental disabilities; (2) a report prepared by an agency or staff person charged with investigating reports of incidents of abuse or neglect, injury, or death occurring at such location, that describes such incidents and the steps taken to investigate such incidents; and (3) a discharge planning record." 42 U.S.C. § 15043(a).  Furthermore, "records" include "[i]ndividual records to which P&A systems must have access under section 143(a)(2), (A)(i), (B), (I), and (J) of the Act (whether written or in another medium, draft, preliminary or final, including handwritten notes, electronic files, photographs or video or audiotape records)."  45 C.F.R. § 1326.25(b).

investigation), "not later than 3 business days after the system makes a written request for the records involved," or, in the case of the death of an individual with a developmental disability, "not later than 24 hours after the system makes such a [written] request."  42 U.S.C. § 15043(a)(2)(J)(i); 45 C.F.R. § 1326.25(c).  The P&A system is permitted to inspect and copy information and records, subject to a reasonable charge offsetting the duplicating costs, and "[i]f a party other than the P&A system performs the photocopying or other reproduction of records, it shall provide the photocopies or reproductions to the P&A system within the time frames specified [above] . . . ."  45 C.F.R. § 1326.25(d).   Finally, HIPAA "permits the disclosure of protected health information (PHI) without the authorization of the individual to a P&A system to the extent such disclosure is required by law and the disclosure complies with the requirements of that law."  45 C.F.R. § 1326.25(e).[6]

Under the PAIMI Act, a P&A system has the authority to, among other things, "investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe the incidents occurred," "have access to facilities in the State providing care or treatment, and "have access to all records of (A) any individual who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access," or "(B) any individual (including an individual who has died or whose whereabouts are unknown) . . . with respect to whom a complaint has been received by the system or with respect to whom as a result of monitoring or other activities (either of which result from a complaint or other evidence) there is probable cause to believe  that such individual has been subject to abuse

---

[6]     The P&A system must comply with the confidentiality provisions of all applicable federal and state laws, and must keep confidential all records and information.  45 C.F.R. § 1326.28(a), (b).

or neglect."  42 U.S.C. § 10805(a).[7]  The P&A system "shall be permitted to inspect and copy

records, subject to a reasonable charge to offset duplicating costs," and access to records under

the PAIMI Act "shall be extended promptly" to the P&A.  42 C.F.R. § 51.41(a), (e).

Additionally, "[i]f a P&A system's access to facilities, programs, residents or records . . . is

delayed or denied, the P&A system shall be provided promptly with a written statement of

reasons."  42 C.F.R. § 51.43.[8]

## III.   ANALYSIS

After carefully considering whether Plaintiff is entitled to a preliminary injunction

requiring Defendants to provide it with full access to the records requested by Plaintiff, the Court

answers this question in the affirmative as to Incarcerated Individual B, but in the negative as to

Incarcerated Individual A, for the relevant reasons stated in the parties' memoranda of law.  To

those reasons, the Court adds the following analysis.

As an initial matter, the Court agrees with Defendants that Plaintiff's motion should be

analyzed under the stricter standard of "clear or substantial" likelihood of success and "strong"

showing or irreparable harm given the nature and extent of relief that Plaintiff seeks.  As

discussed above in Part I.A. of this Decision and Order, Plaintiff seeks a preliminary injunction

ordering Defendants to provide it with complete, unredacted copies of all records requested for

Incarcerated Individual A and Incarcerated Individual B.  (Dkt. No. 1 [Pl.'s Compl.].)  Were this

---

[7]      "Records" include "reports prepared by any staff of a facility rendering care and
treatment or reports prepared by an agency charged with investigating reports of incidents of
abuse, neglect, and injury occurring at such facility that describe incidents of abuse, neglect, or
injury occurring at such facility and the steps taken to investigate such incidents, and discharge
planning records."  42 U.S.C. § 10806(b)(3)(A).  Furthermore, "records" include "[i]nformation
and individual records, whether written or in another medium, draft or final, including
handwritten notes, electronic files, photographs or video or audio tape records."  42 C.F.R. §
51.41(c).

[8]      The system must maintain the confidentiality of records that are required to be
maintained in a confidential manner under any federal or state law.  42 U.S.C. § 10806(a).

Court to grant Plaintiff's request for a preliminary injunction and order Defendants to provide Plaintiff with the requested records, that injunction would alter the status quo that currently exists between the parties in that Plaintiff would now have documents to which Defendants appear to assert that Plaintiff is not entitled. As a result, the Court will apply the stricter standard when assessing Plaintiff's entitlement to a preliminary injunction.

## A.     Clear or Substantial Likelihood of Success on the Merits

First, the Court finds that Plaintiff has shown a clear or substantial likelihood of success on the merits of at least one of its claims, specifically its claims that Defendants' actions regarding the requests for records related to Incarcerated Individual A and Incarcerated Individual B violated the DD and PAIMI Acts. As an initial matter, although these acts contain identical obligations and requirements in many respects, they do contain some differences, so it is important to clarify which act applies to which of the relevant individuals. In the Complaint, Plaintiff alleges that Incarcerated Individual A is an individual with a developmental disability, and Incarcerated Individual B is an individual with a mental illness. (Dkt. No. 1, at ¶¶ 35, 59 [Pl.'s Compl.].) As a result, Plaintiff's claim for a violation of the DD Act applies to Incarcerated Individual A, while Plaintiff's claim for a violation of the PAIMI Act applies to Incarcerated Individual B.

### 1.     Incarcerated Individual A

As to Incarcerated Individual A, Plaintiff argues that Defendants failed to comply with the DD Act both by redacting certain information from the documents they disclosed[9] and by failing to disclose the requested records within the timeframe specified in that Act.

---

[9]      Plaintiff initially also argued that Defendants withheld whole pages of requested records;, but, as evidenced by Defendants' opposition memorandum of law and the materials appended to Plaintiff's reply memorandum of law, Defendant has since provided copies of those withheld pages (albeit not in entirely unredacted form). (Dkt. No. 19, Attach. 1.)

As an initial matter, Defendants argue that Plaintiff has failed to provide proof from someone with first-hand knowledge that it made a request for the relevant records at Five Points, which is especially glaring given that it has provided a request for access only to records at Sullivan (and evidence of a response by Defendants pertaining to records at Five Points). With regard to this last point, Defendants essentially argue that the response by Defendants must pertain to a different records request than the request provided by Plaintiff along with its motion. The Court, however, does not agree.

Beginning with Defendants' argument that Plaintiff has not adduced sufficient evidence that someone with first-hand knowledge made a request for the relevant records at Five Points, although the Court acknowledges Defendants' point about the declaration of an attorney not being based on personal knowledge, the Court cannot ignore the other record evidence that a representative of Plaintiff physically inspected the records of Incarcerated Individual A at Five Points. (Dkt. No. 7, Attach. 7, at 7-9.) The Court also cannot ignore the absence of record evidence that Defendants are in the practice of granting Plaintiff (or its representatives) access to its inmates' records without a proper request. (Indeed, the litigation history between the parties suggests the contrary.) Moreover, the Court is not convinced that evidence of a separate records request is needed, given its rejection of Defendants' related argument that the response by Defendants must pertain to a records request other than the request provided by Plaintiff.

Turning to the merits of that related argument, on February 24, 2020, Plaintiff wrote a letter to Defendants' counsel requesting to physically access records and schedule a legal visit at Sullivan. (Dkt. No. 7, Attach. 7, at 3.) The letter was sent to Defendants' counsel by email on March 10, 2020, along with an indication that Plaintiff was seeking records located at Sullivan and attachments titled "DOCCS Release.pdf," "HIPAA Release," and "OMH Release.pdf."

(Dkt. No. 7, Attach. 7, at 6.)  On June 29, 2020, a representative from Five Points' FOIL office wrote a letter to Plaintiff, in which she (a) stated that Plaintiff had physically visited Five Points on March 11, 2020, to review records, 652 pages of which it tabbed for copying, and (b) provided instructions for paying for having copies of those tabbed records sent to Plaintiff; specifically, this representative noted that these copies had not yet been sent to Plaintiff as of that date.  (Dkt. No. 7, Attach. 7, at 7.)  Plaintiff wrote and sent a check for the copies on July 2, 2020, but, on July 24, 2020, the representative stated in a letter that 83 pages were being withheld from the copies because they were exempt from release; she also indicated that some of the pages included in the copies were redacted.  (Dkt. No. 7, Attach. 7, at 8-9.)

Although Defendants are correct that Plaintiff initially requested to visit Incarcerated Individual A at Sullivan and inspect his records there, there is no logical basis for assuming that Plaintiff's visit to inspect records at Five Points on March 11, 2020 (and the provided records) were related to a different records request.  The records themselves indicate that (a) Incarcerated Inmate A was housed at Sullivan from approximately August 7, 2018, until May 15, 2019 (when he was initially transferred to Five Points); after a series of other transfers, Incarcerated Inmate A was eventually transferred back to Sullivan, and again transferred to Five Points on February 4, 2020.  (Dkt. No. 7, Attach. 7, at 54, 59, 62-63, 69.)  Thus, this evidence shows that (a) Incarcerated Individual A was located at Sullivan at the time he initially made a request for legal assistance to Plaintiff in March 2019, (b) he was only recently transferred from Sullivan to Five Points at the time Plaintiff wrote its letter-request for visitation and physical access to his records, and (c) he was at Five Points at the time Plaintiff physically inspected his records there. Thus, at the time it made its request, Plaintiff appears to have mistakenly believed Incarcerated Individual A was still located at Sullivan, but ultimately visited him and/or inspected his records

at Five Points, where he was actually housed on March 11, 2020.  Because there is simply no

indication that Plaintiff's letter-request of February 24, 2020, and the response from Five Points

are related to separate requests for records, the Court rejects Defendants' argument that Plaintiff

has not shown that it made an appropriate records request for the records of Incarcerated

Individual A at issue in this action.

Defendants additionally argue that Plaintiff was not entitled to certain records because it

failed to provide the appropriate authorizations.  Again, the Court is not persuaded by this

argument based on the evidence.  Notably, the records submitted by Plaintiff include a HIPAA

authorization form signed May 23, 2019, which indicates DOCCS as the entity to release

Incarcerated Individual A's entire medical record including, among other things, mental health

information.  (Dkt. No. 7, Attach. 7, at 3.)  As discussed above, these were provided along with

Plaintiff's request for access; whether they were labelled for Sullivan or Five Points, it is clear

from Plaintiff's email of March 10, 2020, that it sent the appropriate authorizations to

Defendants' counsel before it inspected the records or requested copies.  (Dkt. No. 7, Attach. 7,

at 6.)  There is therefore no record support at this point for Defendants' argument that Plaintiff

failed to show that it had authorization for any of the requested records.[10]

Moreover, Defendants did not persuasively rebut Plaintiff's argument that it is entitled to

unredacted copies of records under the P&A Acts (despite state privacy laws) because those

federal statutes preempt state privacy laws.  "In the absence of an express congressional

command, state law is pre-empted if that law actually conflicts with federal law or if federal law

so thoroughly occupies a legislative field as to make reasonable the inference that Congress left

---

[10]     The Court also notes that the regulations for the DD Act specifically state that HIPAA
"permits the disclosure of protected health information (PHI) without the authorization of the
individual to a P&A system to the extent such disclosure is required by law and the disclosure
complies with the requirements of that law."  45 C.F.R. § 1326.25(e).

no room for the States to supplement it." *Protection & Advocacy for Persons with Disabilities, Conn. v. Mental Health & Addiction Servs.*, 448 F.3d 119, 128 (2d Cir. 2006) (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 [1992]).  Courts that have considered whether the P&A Acts preempt state privacy and other laws have found that preemption does apply.  *See, e.g.*, *Disability Rights of N. Carolina v. Sprouse*, 17-CV-0197, 2018 WL 3785465, at *4 (W.D.N.C. Aug. 9, 2018) (finding that the DD and PAIMI statutes preempt state laws that provide greater restrictions to access on covered records); *Matter of Disability Rights Idaho Request for Ada Cnty. Coroner Records Relating to the Death of D.T.*, 168 F. Supp. 3d 1282, 1294 (D. Idaho 2016) (finding that PAIMI preempted any state law imposing restrictions on record access, including privacy laws) (collecting cases).[11]  Additionally, as a P&A system, Plaintiff is obligated to keep information that is subject to confidentiality laws or requirements confidential even after receiving them from a source.  45 C.F.R. § 1326.28(a), (b).  This duty of confidentiality protects the information in the absence of redaction or withholding of records and further supports a finding that the DD Act was intended to preempt state privacy and other laws related to access to records.[12]  *See Disability Rights New York v. Wise*, 171 F. Supp. 3d 54, 60

---

[11]      The state statutes involved here do not seem to present any extraordinary circumstances that would make this Court think that they should not be treated similarly as the state statutes in the cited cases.  Notably, the statutes cited as authority for Defendants' redactions include N.Y. Pub. Officers L. § 87(2) (New York's law related to access to agency records under the state FOIL system), N.Y. Pub. Officers L. § 96 (New York's law related to disclosure of records by an agency), N.Y. Pub. Health L. § 18 (New York's law related to access and disclosure of patient health information), and N.Y. Mental Hygiene L. § 33.13 (New York's law related to the disclosure of mental health clinical records).

[12]      The Court agrees with Plaintiff that there is also little logical basis for redacting the relevant records in this case, given that it was already provided with physical access to the unredacted records when it inspected them at Five Points, and Defendants have continued to offer Plaintiff physical access to those unredacted records at the facility.  Furthermore, under the governing statute and regulations, Plaintiff is authorized, during any future inspection of the unredacted records, to "use its own photocopying equipment to obtain copies" of the records.  45 C.F.R. § 1326.25(d).

(N.D.N.Y. 2016) (Sharpe, J.) (indicating that "the court agrees with DRNY that the Justice Center cannot withhold records based on their confidential nature," because "[b]oth the PAIMI and DD Acts . . . impose a duty of confidentiality on P&A systems"); *Iowa Protection and Advocacy Servs., Inc. v. Rasmussen*, 206 F.R.D. 630, 635 (S.D. Iowa 2001) (finding that, because PAIMI imposes a duty of confidentiality on the P&A system, issues of confidentiality do not act as a bar to disclosure to the P&A system) (collecting cases).

In any event, even if Defendants were to be found to have now provided unredacted copies of all of the requested records of Incarcerated Individual A to which Plaintiff is entitled under the law, such a finding would not moot Plaintiff's claim because there is no question that Defendants have failed to provide those records within the timeframe required by the DD Act and its regulations. *See Michigan Protection & Advocacy Serv., Inc. v. Flint Cmty. Schs.*, 146 F. Supp. 3d 897, 902-03 (E.D. Mich. 2015) (finding a likelihood of success on the merits where, even though the school eventually provided all of the requested records five or six months after the requests, that level of responsiveness was not either "prompt" or within three business days as required by the statutes, and "its performance history to date causes serious doubts to linger about whether [measures implemented by the school to improve their ability to timely comply with requests] will prove adequate to ensure the district's prompt performance of its disclosure obligations on all occasions in the future").

More specifically, Plaintiff made a written request for access to the records of Incarcerated Individual A, and then it both  physically inspected and tabbed those records on March 11, 2020.[13]  Plaintiff provided Defendants with payment for the copies in accordance with

---

[13]     The Court notes that Defendants did not provide an invoice for copies of the tabbed records until June 29, 2020, despite an *implicit* request for that invoice on May 28, 2020.  (Dkt. No. 7, Attach. 7, at 7, 600-02.)  Although the statute and regulations are silent on the issue of when a service provider must present such an invoice, Defendants are strongly cautioned against incurring a delay in providing one, which would appear to contravene the spirit (if not the letter)

Five Points' instructions on July 6, 2020; but Five Points did not provide Plaintiff with copies of

the records until July 31, 2020.  Setting aside the fact that some of the copies were withheld and

some were redacted, the copies that were provided were thus late, having been due at the latest

within three business days of July 6, 2020 (the date Defendants received payment).[14]  Moreover,

the withheld records were not provided by Defendants until February 5, 2021, more than six

months later (after Plaintiff filed its current motion for preliminary injunction).  Finally, for the

reasons stated above, Defendants have not persuaded the Court that their redactions are

permitted by law.

For all of these reasons, the Court finds that Plaintiff has shown a clear or substantial

likelihood of success on the merits of its claim that Defendants failed to provide the requested

records (in their entirety) for Incarcerated Individual A within the timeframe required by the DD

Act for the purposes of this motion.

## 2.   Incarcerated Individual B

As to Incarcerated Individual B, Plaintiff argues that Defendants have failed to comply

with the PAIMI Act by failing to allow it to physically inspect any records related to

Incarcerated Individual B and failing to provide copies of any such records.  The evidence

provided by Plaintiff indicates that, on February 12, 2020, Plaintiff wrote a letter to Defendants'

counsel stating that it had probable cause to believe that an incident of abuse or neglect had

occurred related to Incarcerated Inmate B and requesting a number of records as well as a quote

for the cost of copying and/or providing the documents.  (Dkt. No. 7, Attach. 7, at 588-90.)  The

---

of the statute and regulations, regardless of whether their overall staffing levels are limited to
essential workers as a result of a pandemic.

[14]    *See* 45 C.F.R. § 1326.25(d) (stating that the P&A has the right to "inspect and copy" and,
"[i]f a party other than the P&A system performs the photocopying or other reproduction of
records, it shall provide the photocopies or reproductions to the P&A system within the time
frames specified," i.e., three business days).

following day, February 13, 2020, Plaintiff sent an email to Defendants' counsel that attached

this request, and also requested *physical access* to Incarcerated Inmate B's records at the facility

to coincide with a visit to that facility on February 18, 2020.  (Dkt. No. 7, Attach. 7, at 591

[stating, in part, "I will be visiting Great Meadow Correctional Facility on Tuesday 2/18 and

request access to all of [Incarcerated Individual B]'s records located there on this day"].)  On

February 14, 2020, Defendants' counsel stated in an email to Plaintiff that records related to

Incarcerated Inmate B "remain subject to a pending investigation and will not be available for

review on February 18, 2020."  (Dkt. No. 7, Attach. 7, at 592.)  On February 26, 2020, Plaintiff

wrote a letter to Defendants' counsel indicating that it had attempted to obtain clarification about

whether the email of February 14 was intended to deny access to all of Incarcerated Individual

B's records at the facility (or only those records specifically related to the pending investigation),

but had not received any substantive response to that question; the letter asserted that Plaintiff is

entitled to access all of Incarcerated Individual B's records, including those related to the

pending investigation, regardless of whether that investigation has yet been completed.  (Dkt.

No. 7, Attach. 7, at 596-97.)  In addition to reiterating Plaintiff's request for copies of the records

at issue, the letter repeated Plaintiff's demand for access to them.  (*Id*. at 596 [stating, in part,

"DOCCS must provide [Plaintiff] prompt access to all requested DOCCS information and

records . . . ."].)  On March 10, 2020, Defendants' counsel stated only that they would arrange

for access to Incarcerated Individual B's records "once [SCOC] has completed its investigation."

(Dkt. No. 7, Attach. 7, at 598.)  On May 28, 2020, Plaintiff reasserted that it was entitled to

records even if the investigation was still pending.  (Dkt. No. 7, Attach. 7, at 601.)  On June 16,

2020, Plaintiff emailed Defendants' counsel seeking a response about the requested records.

(Dkt. No. 7, Attach. 7, at 603.)  On June 29, 2020, Defendants' counsel emailed Plaintiff stating

that it would be in touch "shortly," but did not respond substantively until October 1, 2020, when

it stated that the COVID-19 pandemic was having an effect on its operations, and informed

Plaintiff that the investigation by SCOC into Incarcerated Individual B's death was still ongoing,

and that Plaintiff could submit a records request directly to SCOC.  (Dkt. No. 7, Attach. 7, at

605, 607.)

These circumstances suffice to show a substantial likelihood of success on the merits of

Plaintiff's PAIMI claim.  Granted, the Court has trouble finding that Plaintiff has provided

evidence that Defendants have failed to fulfill their legal duty to provide copies of specifically

identified requested records.  As this Court has previously ruled, "[u]nder any reasonable

construction of the regulatory right to copy non-electronic records oneself or have copies made

by a service provider, the three-business-day clock governing the service provider's copying of

the non-electronic records does not start running until the service provider has been presented

with the particular records to be copied (whether [1] by the P&A directly, following its own

inspection, or [2] through the service provider's retrieval of the records, following a sufficient

identification of them by the P&A to enable the retrieval)." *Disability Rights New York v. New*

*York State DOCCS*, 18-CV-0980, 2020 WL 6484049, at *6 (N.D.N.Y. Nov. 4, 2020) (Suddaby,

C.J.).  In the Court's opinion, based in part on the definition of a "record,"[15] the information

needed to conduct a retrieval (and avoid a search) includes a statement of (a) the individual who

is the subject of the record, (b) the nature of the record, (c) the identity and/or position of the

preparer and/or recipient of the record (including his or her location), and (d) the date of the

---

[15]     As previously explained in this Decision and Order, for purposes of the PAIMI Act,
"records" include "reports prepared by any staff of a facility rendering care and treatment or
reports prepared by an agency charged with investigating reports of incidents of abuse, neglect,
and injury occurring at such facility that describe incidents of abuse, neglect, or injury occurring
at such facility and the steps taken to investigate such incidents, and discharge planning
records."  42 U.S.C. § 10806(b)(3)(A).

record.  Here, setting aside the fact that each of Plaintiff's requests only implicitly identifies the preparer and/or recipient of the records sought, each of Plaintiff's requests omits either a specific date of the records sought (relying on a date range) or any date at all, thus arguably requiring a search by a records custodian.  (Dkt. No. 7, Attach. 7, at 589-90.)  As a result, it would be difficult for the Court to find that a search is *not* required by Plaintiff's request.  The Court emphasizes that conducting such a search is not the duty of a service provider, which may be required only to copy records that have either been flagged by Plaintiff or sufficiently described by Plaintiff to be simply retrieved by the service provider.

However, the Court finds that Plaintiff has provided evidence that Defendants effectively denied Plaintiff physical access to the requested records of Incarcerated Individual B.  As an initial matter, the Court finds that Defendants have not persuaded it that *all* of the requested records of Incarcerated Individual B (i.e., reports regarding his care and treatment in addition to reports regarding an investigation into his death) were either in the exclusive custody of SCOC or unavailable due to the SCOC investigation.  (*See, e.g.,* Dkt. No. 7, Attach. 7, at 592, 601.)[16]  In any event, the Court also finds that suspending access granted to the P&A system by the PAIMI Act during the pendency of an investigation by an agency other than the P&A system would appear to defeat the purpose of the PAIMI Act, which recognizes the P&A system is designated as the entity with a unique mandate to conduct such investigations to protect individuals with mental illness and developmental disabilities.  *Cf. Disability Rights Wisconsin, Inc. v. State of*

---

[16]     The Court notes that Plaintiff is, of course, entitled to not only SCOC's report (or draft thereof) but the records of the care and treatment of Incarcerated Individual B.  *See* 42 U.S.C. § 10806(b)(3)(A) (explaining that "records" include "reports prepared by any staff of a facility rendering care and treatment . . ."); *cf. Disability Rights New York v. Wise*, 171 F. Supp. 3d 54 (N.D.N.Y. 2016) (Sharp, J.) (finding that the DD and PAIMI acts allow for access to "all relevant records in possession" of the agency, which includes both reports made by an investigatory agency and "supporting information relied upon in creating a record, including all information and records used and reviewed in preparing reports of abuse, neglect, or injury").

*Wisconsin Dept. of Public Instruction*, 463 F.3d 719, 729 (7th Cir. 2006) (noting that "[t]o withhold the records in contention here is to give the generalist agency . . . the last word over matters of abuse and neglect of the disabled or mentally ill.  This clearly defeats the purposes of DRW and the federal P&A statutes").

Defendants' arguments that Plaintiff did not request the ability to physically inspect the records of Incarcerated Individual B and that Plaintiff has not sufficiently shown that it had probable cause to request those records are both unavailing.  As to this first argument, the evidence discussed above shows that on February 13, 2020, Plaintiff requested in writing the ability to visit the relevant facility on February 18, 2020, and inspect the records at issue there in person, a requested review that Defendants denied in writing on February 14, 2020.  The evidence also shows that Plaintiff sufficiently repeated this demand of access in writing on February 26, 2020, a requested review that Defendants again denied in writing on March 10, 2020.  Defendants have cited no authority, and the Court is aware of no authority, for the point of law that a written request for copies of records (under the PAIMI Act and its regulations) somehow eviscerates a subsequent or accompanying written request for physical access to those records.

As to this second argument, again the Court will not linger on the belated nature of this late-blossoming reason for denying Plaintiff access to the records of Incarcerated Individual B.  More important is the lack of persuasive legal authority provided by Defendants for the point of law that a P&A system's probable cause determination must be supported by the details of the complaints that it has received (e.g., the dates, sources, form, and/or substance of those complaints) at this stage of the proceeding.[17]  Indeed, persuasive authority exists for the contrary

_____

[17]     Defendants cite *Disability Rights New York v. Wise*, 171 F. Supp. 3d 54 (N.D.N.Y. 2016) (Sharpe, J.), for the point of law that Plaintiff was required to provide information in support of its probable cause determination.  However, the fact that Plaintiff in *Wise* provided, of its own

point of law.  *See, e.g., Iowa Protection and Advocacy Servs., Inc. v. Gerard Treatment Programs, L.L.C.*, 152 F. Supp. 2d 1150, 1172 (N.D. Iowa 2001) (concluding that specific evidence to establish probable cause was not necessary on a motion for preliminary injunction because, unlike where a challenge to probable cause is "before the court on a summary judgment record, the present case is before the court on little more than the pleadings and a request for a preliminary injunction").  In any event, the Court finds that, for purposes of its review of Plaintiff's probable cause determination at this stage of the proceeding, Plaintiff has met its burden.[18]  In its Complaint, Plaintiff alleged that it received complaints in December 2019 and January 2020 alleging that Incarcerated Individual B suffered abuse and neglect while in DOCCS' custody, and Attorney Caturano affirmed in her declaration that Plaintiff had received

---

accord, specific facts concerning its investigation in support of its probable cause determination does not suggest that such presentation of facts is required.  *Wise*, 171 F. Supp. 3d at 56. Notably, it does not appear that Plaintiff's probable cause determination was even at issue in *Wise*, and thus the Court had no reason to rule on any issue related to the sufficiency of that probable cause determination.  *Id.*  Similarly, Defendants' citation to this Court's ruling on a motion for preliminary injunction in *Disability Rights New York v. Northern Rivers Family Servs., Inc.*, 16-CV-0176 (N.D.N.Y.) (Suddaby, C.J.), is unavailing, because there the Court did not consider what level of specification is required to make a sufficient showing of probable cause under the statute; rather, the Court addressed what level of proof is required to establish that the agency or facility in question housed, treated, or assisted individuals with mental illness or developmental disabilities.  *Northern Rivers*, 16-CV-0176, Decision and Order, at 20-23, 28-32 (N.D.N.Y. filed June 6, 2016).  As to the other cases Defendants cite, those do not support the specific point of law on which Defendants attempt to rely.  (Dkt. No. 18, at 14-15 [Defs.' Opp'n Mem. of Law].)  Indeed, the Court notes that *Disability Rights Washington v. Rolfe*, 12-CV-5004, 2012 WL 1409628, at *3 (W.D. Wash. Apr. 23, 2012), stands for the point of law that the Court's level of review of Plaintiff's probable cause determination and this stage of the proceeding is "cursory."

[18]    While the Court acknowledges non-binding authority for the point of law that pre-access judicial review of a P&A system's probable-cause determination is unnecessary, the Court rejects any suggestion by Plaintiff that no judicial review whatsoever of its probable cause determination is permitted.  As the Court has previously observed, it "respectfully views with a suspicious eye the notion that the government possesses the authority to confer on a private entity the right to evade judicial review of the entity's probable-cause determinations . . . ." *Disability Rights New York v. New York State DOCCS*, 18-CV-0980, 2019 WL 4643814, at *33 (N.D.N.Y. Sept. 24, 2019) (Suddaby, C.J.). The Court is unaware of any principal of law that permits a transferor to convey to a transferee more than what the transferor possesses.

such complaints.  (Dkt. No. 1, at ¶ 62 [Pl.'s Compl., alleging that, "[i]n December 2019 and January 2020, DRNY received complaints alleging that Incarcerated Individual B suffered abuse and neglect while in DOCCS' custody"]; Dkt. No. 7, Attach. 5, at ¶ 4 [Caturano Decl., swearing that "DRNY received complaints alleging that Incarcerated Individual B was subject to abuse and neglect while he was in DOCCS' custody"].)  Moreover, Defendants concede that, as early as February 14, 2020, there was an investigation by the SCOC into the death of Incarcerated Individual B, and that it was pending at least until October 1, 2020, suggesting there was a readily apparent issue of some substance to investigate.  (Dkt. No. 7, Attach. 7, at 592, 607.) Should Plaintiff not avail itself of the opportunity to inspect the records of Incarcerated Individual B by the deadline for motions for summary judgment in this action, Defendants may renew their challenge to Plaintiff's probable-cause determination then.

Based on the above, Plaintiff has sufficiently shown a clear or substantial likelihood of success on the merits of both of its claims.

### A.      Strong Showing of Irreparable Harm

As an initial matter, the Court observes that multiple district courts have concluded that failure to comply with the P&A Acts in a way that prevents the P&A system from pursuing its full right to access records and fulfill its mandate constitutes irreparable harm as a general matter.  *See, e.g., Disability Rights New York v. New York State DOCCS*, 18-CV-0980, 2019 WL 4643814, at *21 (N.D.N.Y. Sept. 24, 2019) (Suddaby C.J.) (finding that denial of records or untimely provision of records left plaintiff with no other adequate remedy at law and that plaintiff "would be irreparably harmed if it is 'prevented from pursuing fully its right to access records' in furtherance of its statutory duties"); *Disability Rights Florida, Inc. v. Jacobs*, 473 F. Supp. 3d 1335, 1340 (M.D. Fla. Aug. 27, 2019) (finding that the defendants' refusal to provide

the P&A system plaintiff with access to the facility "does, in a very real and readily identifiable way, pose a threat to [plaintiff's] being able to discharge its obligations[,] [a]nd no amount of damages will remedy that sustained harm"); *Matter of Disability Rights Idaho*, 168 F. Supp. 3d at 1300 (noting that "[n]umerous courts have concluded that a P&A's inability to meet its federal statutory mandate to protect and advocate on behalf of those with mental illness constitutes irreparable harm," and finding that the failure by the defendant to turn over coroner's records to which the P&A system was entitled under PAIMI constituted immediate and irreparable harm); *State of Connecticut Office of Protection and Advocacy for Persons with Disabilities v. Hartford*, 355 F. Supp. 2d 649, 653 (D. Conn. 2005) (noting that "[c]ourts have concluded that a protection and advocacy system's inability to meet its federal statutory mandate to protect and advocate the rights of disabled people . . . constitutes irreparable harm," and that the only adequate relief available to the plaintiff were it to succeed on the merits of its claim was to require defendants to provide access to the relevant records); *cf. Wise*, 171 F. Supp. 3d at 61-62 (noting that, "[b]y redacting and withholding portions of its reports, the Justice Center has interfered with DRNY's mandate to protect and advocate on behalf of individuals with mental illness and developmental disabilities, and particularly its mandate to investigate incidents of abuse and neglect" and that "defendants' contention that access to the entirety of information included in the reports of investigatory agencies is not essential to a P&A system's statutory mandate is contrary to the explicit language of the statutes granting P&A systems access to such reports."). Thus, where a violation of the P&A statutes interferes with Plaintiff's ability to investigate allegations of abuse or neglect or otherwise fulfill its statutory mandate, irreparable harm has occurred.

### 1.    Incarcerated Individual A

As to Incarcerated Individual A, for the sake of brevity, the Court will not linger on the fact that Plaintiff was granted access to physically inspect the records at issue in an unredacted form at Five Points on March 11, 2020.[19]  Nor will the Court linger on the fact that at issue here is not the entirety of the 652 pages of records that Plaintiff flagged for copying on that date but merely the isolated material that Defendants redacted in the copies that they eventually provided.[20]  More important is the fact that, as of October 1, 2020, Defendants would again grant Plaintiff access to return to physically inspect the records in an unredacted form.[21]  Based on Defendants' argument that Plaintiff's requests for these copies is now moot, the Court trusts that the access that Defendants are offering Plaintiff includes an honoring of Plaintiff's statutory and regulatory right to not only "make written notes" regarding the material that Defendants have redacted in their copies but "use its own photocopying equipment to obtain copies" of that material.[22]  In response to any argument by Plaintiff that (under the circumstances) it has the right to obtain unredacted copies made by *Defendants*, such a right does not suffice to satisfy this prong of its motion, which requires a strong showing of a substantial chance that it will

---

[19]      (Dkt. No. 7, Attach. 6, at ¶ 7; Dkt. No. 7, Attach. 7, at 7.)

[20]      (*See, e.g.,* Dkt. No. 7, Attach. 7, at 27, 42-53, 83, 85, 91, 93, 99, 186, 208, 233, 257, 268, 281-91, 293, 303, 329, 330, 352-53, 369-70, 390-99, 401, 412, 429, 431, 443, 447, 454, 462-63, 481-82, 489, 492, 550, 569; Dkt. No. 19, Attach. 1, at 6, 15.)

[21]      (Dkt. No. 7, Attach. 7, at 608 [Letter of Oct. 1, 2020, stating in pertinent part, "The Department is now resuming in-person visitation at our facilities and recommends scheduling a mutually convenient facility visit to review and flag any outstanding records sought for [Incarcerated Individual A] . . . "]; Dkt. No. 18, at 15 [Defs.' Opp'n Memo. of Law, arguing in pertinent part, "On October 1, 2020, DOCCS offered DRNY the opportunity to once again inspect and review whatever records it was seeking for Incarcerated Individual A and suggested that DRNY schedule a site visit"].)

[22]      The Court notes that it is aware of no reason that Plaintiff's "own photocopying equipment" under 45 C.F.R. § 1326.25(d) cannot include a common smart phone (i.e., one equipped with a camera, if not also a portable-scanning app).

experience certain and imminent harm if injunctive relief is not granted until the final resolution

of this action.  Simply stated, the certainty and imminence of any harm is precluded by the fact

that Plaintiff is not currently being prevented from accessing and itself copying the material in

question.[23]  The Court hastens to caution Defendants, however, that, if they refuse to permit

Plaintiff to access and itself copy the material in question, the Court will seriously consider the

imposition of sanctions under, in part, Fed. R. Civ. P. 11(b).

For all of these reasons, the Court denies Plaintiff's motion to the extent that it requests a

preliminary injunction with regard to the records of Incarcerated Individual A.

### 2.    Incarcerated Individual B

As to Incarcerated Individual B, Plaintiff alleges that Defendants have not only refused to

provide copies of any of the requested records, but refused to allow Plaintiff to physically access

any records due to a pending investigation by SCOC.  As a result, Plaintiff has been unable to

investigate Incarcerated Individual B's death for more than a year since receiving complaints of

abuse or neglect.  Although Incarcerated Individual B is deceased (and thus not subject to a

threat of further abuse or neglect), Defendants' apparent refusal to provide any access has

prevented Plaintiff from conducting an investigation into his death and thus thwarted Plaintiff's

ability to fulfill its statutory mandate.  *See, supra,* Part III.B. of this Decision and Order (citing

cases for the point of law that preventing a P&A system from pursuing its full right to access

records and fulfill its mandate constitutes irreparable harm).[24]  The fact that SCOC is performing

---

[23]     The circumstances of this case differ from those in *Wise* in that, in that case, the
defendants did not provide Plaintiff with physical access to the unredacted records in question
(but rather only redacted copies of them), whereas here Plaintiff does not dispute that it has
indeed received physical access to unredacted versions of the relevant records.  *Wise*, 171 F.
Supp. 3d at 62.

[24]     The Court notes that the fact that Individual B is deceased does not mitigate this harm.
*See Wisconsin Coalition for Advocacy, Inc. v. Czaplewski*, 131 F. Supp.2d 1039, 1051 (E.D.
Wisc. 2001) (rejecting defendants' argument that no irreparable harm existed because "Plaintiff

an investigation in the meantime does not mitigate this harm to Plaintiff.  *See Gerard Treatment Programs*, 152 F. Supp. 2d at 1173 ("Whether or not other investigations have already been conducted of alleged abuse and neglect at Gerard, and whether or not any investigation already undertaken by IPAS or likely to be undertaken by IPAS has or will reveal that no abuse or neglect has occurred at Gerard, IPAS is still irreparably harmed by being prevented from pursuing fully its right to access records and patients . . . in pursuit of its duty to investigate circumstances providing probable cause to believe abuse or neglect may be occurring."), *accord, Iowa Protection and Advocacy Servs. v. Rasmussen*, 521 F. Supp.2d 895, 899, 901 (S.D. Iowa 2002) (addressing circumstance in which an investigation by the Iowa Department of Internal Affairs had been completed and an investigation by the U.S. Department of Justice was ongoing).

For all of these reasons, the Court finds that Plaintiff has satisfied its burden to make a strong showing irreparable harm as to the records of Incarcerated Individual B, but not as to the records of Incarcerated Individual A.

### A.      Balance of the Equities

The Court finds that the balance of equities favors Plaintiff in this case.  As Plaintiff argues, Defendants' failure to provide sufficient access to records hampers its ability to fulfill its federal mandate to aid individuals with mental illness or a developmental disability and to conduct investigations into potential abuse or neglect of those individuals.  On the other hand, the only apparent hardship that Defendants face from the issuance of a preliminary injunction concerns a decreased capacity to pull records, supervise records reviewers, and/or make copies due to limitations imposed by the COVID-19 pandemic, because a general requirement to follow

---

cannot seriously argue that if it is prevented from reviewing deceased residents' records, the deceased residents may be injured or die").

the law does not impose a hardship. *See Matter of Disability Rights Idaho*, 168 F. Supp. 3d at 1300 (D. Idaho, 2016) (recognizing that issuing an injunction does not subject defendants "to a penalty or hardship since it requires them to do exactly what [the P&A statutes] require"). However, given that Defendants have apparently not denied all physical access to records on this basis (i.e., they allowed Plaintiff physical access to Incarcerated Individual A's records and denied physical access to Incarcerated Individual B's records based on the pending investigation, not pandemic safety concerns) and have not alleged any safety concerns for incarcerated individuals or staff that would impose a hardship on them if Plaintiff were provided physical access to and/or copies of records, the Court must find that any hardship created by the circumstances of the pandemic does not outweigh Plaintiff's hardships in being prevented from pursuing its objectives to investigate allegations pursuant to its mandate.

### B.     Public Interest

Similarly, the public interest weighs in favor of granting a preliminary injunction. Indeed, the public interest is served by Plaintiff's ability to access records to carry out its federal mandate. *See Jacobs*, 473 F. Supp. 3d at 1340 (finding that "it would undermine federal law and disserve the public if DRF could not access Lakeside and access statutorily-granted duties under the PAIMI Act"); *Matter of Disability Rights Idaho*, 168 F. Supp. 3d at 1301 (finding that an injunction would be in the public interest because "[i]t would undermine congressionally mandated independent review if P&As were unable to review records such as those requested here").

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's motion for a preliminary injunction (Dkt. No. 7) is **GRANTED** **in part** (i.e., with regard to Incarcerated Individual B) and **DENIED** **in part** (i.e., with regard to Incarcerated Individual A); and it is further

**ORDERED** that Defendants shall provide Plaintiff with access to any requested records for Incarcerated Individual B in its possession in accordance with Plaintiff's federally mandated P&A authority.

Dated: July 23, 2021
      Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge